**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**


HGR CONSTRUCTION, INC.,

       Plaintiff,

v.                                                                      Case No:  6:18-cv-1406-Orl-40LRH

THE HANOVER INSURANCE
COMPANY,

       Defendant.

_____/

## <u>ORDER</u>

This cause is before the Court on Defendant The Hanover Insurance Company's ("**Hanover**") Motion for Judgment as a Matter of Law. (Doc. 191 (the "**Motion**")). Plaintiff HGR Construction, Inc. ("**HGR**") has filed a Response in Opposition. (Doc. 206). Upon due consideration, the Motion is granted, and judgment is entered in favor of Defendant Hanover.

**I.      BACKGROUND**

**A.      The Coverage Issues**

Plaintiff HGR began this action against Defendant Hanover, seeking to recover insurance proceeds for alleged losses during its construction of a Rooms To Go ("**RTG**") showroom in Baton Rouge, Louisiana (hereinafter, the "**Project**"). (Doc. 1). Plaintiff HGR asserts that Defendant Hanover breached its obligations under a builder's risk policy (the "**Policy**") by: (1) denying coverage for costs to remove and replace damaged glass panels at the Project, and (2) denying coverage for costs incurred by Plaintiff HGR to accelerate

and finish work at the Project in response to flood conditions. (*Id.*). Defendant Hanover disputes coverage for Plaintiff HGR's claims. (Doc. 10).

Plaintiff HGR alleged that a glass curtainwall system installed at the RTG store sustained pervasive scratching on the interior and exterior surfaces. (Doc. 1, ¶¶ 22–23). Plaintiff HGR claimed the damage was caused either by the fabricators who supplied the panels, by the cleaning companies, or by vandalism. (*Id.* ¶ 26). Plaintiff HGR had to replace the damaged curtainwall and presented a claim to Defendant Hanover, which was denied. (*Id.* ¶¶ 25, 27–28). That said, the Policy excludes coverage for "[f]aulty, inadequate or defective . . . [d]esign, specifications, workmanship, repair, [or] construction." (Doc. 68). At the end of the Plaintiff HGR's case-in-chief, the Court granted Defendant Hanover's Rule 50(a) motion for judgment as a matter of law on the glass claim (Doc. 1, ¶¶ 18–31), finding the damage to the glass installed by Plaintiff HGR's sub-contractor at the RTG store was caused by faulty, inadequate or defective design, workmanship, or repair. (Doc. 177).[1]

The balance of the trial concerned claims to recoup various expenses characterized by the Plaintiff HGR as resulting from a covered loss to Covered Property. That is, Plaintiff HGR cites severe flooding as a covered loss that forced it to incur additional costs for supervision, the placement of stone and related equipment rentals, rework grading, additional concrete, and general conditions. (Doc. 182). Plaintiff HGR

---

[1]   See Doc. 211, 122:25–126:12. Nor did the Plaintiff present evidence at trial in support of its vandalism theory.

also submitted a claim for painting and drywall, the lease of a crane, and work necessary to accelerate the project to meet a completion deadline. (*Id.*).[2]

### B.      The Rule 50(a) Hearing

At the Rule 50 hearing, Defendant Hanover asserted that the costs sought by Plaintiff HGR did not result from a covered loss to or the repair of covered property. (Doc. 211, 126:18–21). Defendant Hanover argued that the costs associated with the work performed by IKON was a design change through which Plaintiff HGR decided to pour additional concrete rather than wait for soil to dry. (*Id.* at 127:21–128:5). As a result, the item does not reflect damage—that is, a covered loss to Covered Property. (*Id.* at 128:11–18). Similarly, Defendant Hanover characterized the charges relating to adding limestone to the access road as having nothing to do with Covered Property, describing the work as site maintenance unrelated to a covered damage to Covered Property. (*Id.* at 129:1–7). Finally, Defendant Hanover submitted that the General Conditions charges are payable under the Policy only if the work extended beyond the completion date of the contract, and here the work was finished early. (*Id.* at 129:19–130:4).

Following argument by Defendant Hanover, the Court discussed its preliminary interpretation of covered loss and Covered Property, including the meaning of permanent, appurtenant, and temporary structures as related to Plaintiff HGR's remaining claims. (*Id.* 134:1–137:23). The Court noted that the verdict form allowed the jury to identify each category of expense claimed by Plaintiff HGR and that the wisest approach was to defer ruling on Defendant Hanover's motion. (*Id.* at 137:25–139:25). Thus, should the Court of Appeals disagree with this Court's interpretation of the Policy's provisions to the extent

---

[2]      The jury declined to award damages for these four items. (*Id.*).

that the analysis favors Defendant Hanover, the Court of Appeals could simply reinstate jury's verdict. (*Id.*). The Court asked Plaintiff HGR and Defendant Hanover if they object to proceeding in this way, and they both concurred with the suggested approach. (*Id.* at 140:2–11).

## II.    LEGAL STANDARDS

### A.    Judgment as a Matter of Law

Judgment as a matter of law should be granted only if no objectively reasonable jury, based on the evidence and inferences adduced and through exercising impartial judgment, could reach the verdict rendered. FED. R. CIV. P. 50; *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997). Put another way, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in his favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). Yet where substantial evidence in the trial record would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate. *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010). In considering a motion for judgment as a matter of law, the district court must review the record and draw all reasonable inferences derived from it in the light most favorable to the non-moving party. *Brown*, 597 F.3d at 1173. The district court must not make credibility determinations or weigh evidence, as these are functions reserved for the jury. *Id.*

"Pursuant to Rule 50(a), a party moving for judgment as a matter law before the case is submitted to the jury must 'specify . . . the law and facts that entitle the movant to

judgment.'" *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010). Rule 50(b) permits the moving party to renew the motion post-judgment. FED. R. CIV. P. 50(b). That said, the Eleventh Circuit "repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Howard*, 605 F.3d at 1243 (citing *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir.2004)). The purpose of requiring the grounds asserted in a Rule 50(b) motion to align with those asserted in a Rule 50(a) motion

> is to avoid making a trap of the motion for judgment notwithstanding the verdict, either at the trial stage or on appeal. When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend the case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed, and nothing can be done except by way of a completely new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.

*Id.* (quoting *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir.1986)). So long as the arguments raised post-trial are "closely related" to those advanced at trial, "such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party, the purposes of the rule will be satisfied." *Id.*

## B.    Interpretation of Insurance Contracts

"When analyzing an insurance contract, it is necessary to examine the contract in its context and as a whole, and to avoid simply concentrating on certain limited provisions to the exclusion of the totality of others." *Swire Pac. Holdings, Inc. v. Zurich Ins.,* 845 So. 2d 161, 165 (Fla. 2003). Here, we are dealing with a builder's risk policy. (Doc. 68-2).

Builder's risk insurance is a type of property insurance coverage, not liability insurance. "The purpose of this type of insurance is to provide protection for fortuitous loss sustained during the construction of the building. If a described loss occurs, the insurer generally pays the cost of removing the debris, salvaging material and equipment, and repairing the damaged property." *Id.*

Even so, the losses for which coverage is provided depend on the specific language and exclusions of the builder's risk policy. It is well-settled that absent ambiguity in a policy's language, "insurance contracts must be construed in accordance with the plain language of the policy." *Id.* "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the insurance policy is considered ambiguous." *Auto-Owners Ins. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Ambiguous contract provisions are construed "liberally in favor of the insured and strictly against the insurer who prepared the policy." *Prudential Prop. & Cas. Ins. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993).

In *State Farm Mut. Auto. Ins. v. Pridgen*, the Florida Supreme Court announced the rule to be followed in interpreting exclusionary clauses in insurance policies:

> [E]xclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured, since it is the insurer who usually drafts the policy. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979). However, "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite. It does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.*

498 So. 2d 1245, 1248 (Fla. 1986). Simply because a provision is complex and requires analysis for application does not automatically render it ambiguous. *See Eagle Am. Ins.*

*v. Nichols*, 814 So. 2d 1083, 1085 (Fla. 4th DCA 2002). Finally, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners*, 756 So. 2d at 34; *see also* FLA. STAT. § 627.419(1) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto.").

## III.   DISCUSSION

### A.   Plaintiff HGR's Procedural Objection

Plaintiff HGR contends that Defendant Hanover is precluded from raising its contract interpretation arguments in its post-trial motion, because "Hanover never uttered the word 'appurtenant' in making its Rule 50 motion on the Flood Claim." (Doc. 206, p. 3). Similarly, Plaintiff HGR claims that Defendant Hanover did not argue that "the temporary access road and driveway constructed by HGR was an unfinished appurtenant structure." (*Id.*). Finally, Plaintiff HGR submits that Defendant Hanover failed to assert that the access road did not qualify as a temporary structure. (*Id.* at p. 4). Plaintiff HGR claims that Defendant Hanover has ambushed them by advancing its interpretation of the Policy in its Rule 50(b) motion. (*Id.* at p. 2).

The Court finds that Plaintiff HGR's argument construes the record too narrowly. At the Rule 50(a) hearing, Defendant Hanover argued the costs claimed by Plaintiff HGR did not result from a covered loss to or repair of covered property. Defendant Hanover also asserted that work performed by IKON was a design change which is not covered by the Policy. As for the access road, Defendant Hanover described this as maintenance work unrelated to a covered damage to Covered Property. Recognizing that Defendant

Hanover's arguments depended on interpreting the Policy, the Court thereafter discussed its understanding of permanent, appurtenant, and temporary structures as defined in the Policy and noted that several coverage arguments advanced by Defendant Hanover had merit. For these reasons, the Court, with the consent of both Plaintiff HGR and Defendant Hanover, deferred ruling on the Rule 50(a) motion, opting to await the return of the jury's interrogatory verdict.

While Plaintiff HGR cites *Nat'l Indus.*, it omits the most pertinent portion of the Eleventh Circuit's opinion. The Court held that because the rule prohibiting a party from raising an issue not addressed at the initial Rule 50 motion is "a harsh one, we have taken a liberal view of what constitutes a motion for directed verdict." *Nat'l Indus.*, 781 F.2d at 1549. Thus, if the opposing party is not "lulled into complacency" over the issue raised in the Rule 50(b) motion, the motion is proper. *Id.* As the Court stated in *Howard*, if the issues raised post-trial are "closely related" to those advanced at trial, "such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party, the purposes of the rule will be satisfied." 605 F.3d at 1239.

Here, Defendant Hanover challenged whether the expenses claimed by Plaintiff HGR stemmed from a covered loss to Covered Property in their Rule 50(a) motion. Plaintiff HGR cannot profess surprise at Defendant Hanover's Rule 50(b) argument, which focuses on interpreting Covered Property and covered loss, when both Defendant Hanover and the Court discussed these concepts in detail at the Rule 50(a) hearing. As a result, Plaintiff HGR's procedural objection to Defendant Hanover's Rule 50(b) motion is overruled.

**B.      The Relevant Policy Provisions**

The relevant provisions of the Policy are as follows:

A. Coverage

We will pay for direct physical "loss" to Covered Property caused by or resulting from any of the Covered Causes of Loss unless the loss is excluded or subject to limitations.

>     1. Covered Property
>
>> a. "Buildings and structures" in the course of construction and described in the Builders Risk Schedule of Coverages and located at the described construction site. We also cover foundations of "Buildings and Structures"; pipes and wiring above or beneath the surface of the grounds; machinery and equipment; and related property provided such property is, or will become, a component part of the completed "buildings or structure";
>>
>> b. Construction materials and supplies that will become a permanent part of the completed 'Buildings and Structures' while located at the described construction site.
>>
>> ***
>>
>> c.    Temporary structures; false-work, cribbing, construction forms; scaffolding, fences and signs, and similar property built or erected at the construction site shown on the Schedule which are used in conjunction with the construction of 'Buildings or Structure'
>>
>> ***
>
>     2. Property Not Covered
>
>> a. Any "Pre-Existing Structure";
>>
>> b. Water or land, including land on which Covered Property is located.
>>
>> ***
>
>     3. Additional Coverages

\*\*\*

g. Additional Coverage – Excavation Expense

We will pay those reasonable and necessary expenses that you incur to re-grade or re-prepare the described construction site as a result of a Covered Cause of Loss to Covered Property. This is included within the Limit of Insurance applicable to any one "Building or Structure".

h. Additional Coverage – Expediting Expense

In the event of covered "loss" to Covered Property, we will pay those reasonable and necessary expenses you incur to expedite the temporary repair and the permanent repair or replacement of Covered Property including additional overtime wages and express or other rapid means of transportation. The most that we will pay in any one occurrence for Expediting Expense is $100,000.

\*\*\*

5. Covered Causes of Loss

Covered Cause of Loss means direct physical "loss" caused by or resulting from any cause except those causes of "loss" listed in the Exclusions section.

\*\*\*

G. Definitions

\*\*\*

3. 'Buildings or Structures' means structures which are meant to be permanent structures. Also included are appurtenant permanent structures including sidewalks, walkways, driveways, roadways and their related fixtures provided such work is included within the contract of construction and if the values are included within the completed value.

\*\*\*

BUILDERS'S RISK AND FLOOD AND RELATED WATER

> This endorsement modifies the Builders' Risk Coverage Form:
>
> A. Flood and Related Water Loss Coverage—Annual Loss Endorsement
>
> > When coverage for Flood and Related Water is indicated on the Flood and Related Water Schedule, we cover 'loss' caused by or resulting from flood and related water (except as excluded below) at all location(s) described in the Schedule except those locations described on the Schedule for which we do not show a Flood and Related Water Limit of Insurance or for which a Flood and Related Water Limit of Insurance of "not covered is shown.

(Doc. 184-1, pp. 28–37, 45, 47).

## C.    "Covered Loss" and "Buildings and Structures"

A builder's risk insurance policy serves the purpose of protecting "fortuitous loss sustained during the construction of the building." *Zurich Ins.*, 845 So.2d at 165. The scope of coverage is discerned by interpreting the contract to determine what type of loss is covered and what property or activity falls within the meaning of covered property. The policy issued by Defendant Hanover provides coverage for "direct physical 'loss' to Covered Property caused by or resulting from any of the Covered Causes of Loss unless the loss is excluded or subject to limitations." (*Id.* at p. 28). Plaintiff HGR claims losses because of a severe storm that caused flooding. The term covered loss, as used in the Builder's Risk Flood and Related Water endorsement, includes "[f]lood." (*Id.* at p. 47). Thus, direct physical loss to Covered Property by flooding is covered, unless otherwise subject to an exemption. This invites the question what Covered Property is.

Covered Property includes "Buildings and Structures" and "Temporary Structures." (*Id.* at p. 28). "'Buildings or Structures' means structures which are *meant to be permanent* structures. Also included are appurtenant permanent structures including sidewalks,

walkways, driveways, roadways, and their related fixtures." (*Id.* at p. 45) (emphasis added). The plain reading of the contract teaches that "Buildings or Structures" includes structures that are not yet completed—that is, structures "which are meant to be permanent structures."

By contrast, the term "appurtenant permanent structures" lacks the qualifying language—*i.e.*, "meant to be permanent"—and so the plain language limits appurtenant permanent structures to completed structures and not those in the process of being completed. Finally, "temporary structures" are limited to structures "used in conjunction with the construction of 'Buildings or Structure[s]." (*Id.* at p. 28). The policy provides examples of temporary structures to include "false-work, cribbing, construction forms; scaffolding, fences and signs and similar property built or erected at the construction site [and] . . . which are used in conjunction with the construction of 'Buildings and Structures.'" (*Id.*). Yet land, including land on which Covered Property is located, is not included in the definition of Covered Property. (*Id.* at p. 29).

### D.      "Covered Expenses"

The builder's risk policy provides additional coverage for certain expenses in the event of a covered loss. Defendant Hanover agrees to pay "those reasonable and necessary expenses that you [Plaintiff HGR] incur to re-grade or re-prepare the described construction site as a result of a Covered Cause of Loss to Covered Property." (*Id.* at p. 31). Defendant Hanover also agrees, in the event of a covered loss, to "pay those reasonable and necessary expenses you [Plaintiff HGR] incur to expedite the temporary repair and the permanent repair or replacement of Covered Property." (*Id.*). The plain

language of the Policy predicates payment of expenses upon having incurred direct physical loss from flooding.

### E.    The Policy as Applied to HGR's Claims

Defendant Hanover submits that the itemized damages in the jury's verdict "reflect that the jury misapprehended the coverage issues and awarded damages for expenses claimed by HGR which bore no relationship at all to a loss to Covered Property." (Doc. 191, p. 5). The Court will address each expense for which the jury awarded damages in turn.[3]

#### 1.    *Supervision Expenses*

The jury awarded $21,333.97 for supervision. (Doc. 181, p. 2). Defendant Hanover argues that Mr. Matt Minter, Plaintiff HGR's corporate representative, testified that these expenses represent the retention of additional supervisors to accelerate completion of the sidewalk and paving. (*Id.*). Defendant Hanover contends that the flood occurred before construction began on the sidewalk and paving, and so they were not damaged by the flood and were not being repaired or replaced. (*Id.*). Without damage directly caused by a covered loss, the Policy does not provide additional coverage for excavation expenses (re-grade or re-prepare), and it does not cover expediting expenses, which include supervision expenses. (*Id.*).

Defendant Hanover's argument centers upon the testimony of Mr. Minter. Mr. Minter discussed Plaintiff's Exhibit 44, which lists a summary of Plaintiff HGR's expenses

---

[3]   Defendant Hanover explains why costs claimed by Plaintiff HGR for landscape re-grading and work performed by Systems Painting & Drywall, Florida Crane & Sons, and Duggan are not compensable under the policy. (*Id.* at p. 7). That said, the jury did not award damages for these, and so the Court will not address Defendant Hanover's arguments about these claims.

associated with the flood. (Doc. 209, 52:11–15). According to Mr. Minter, Plaintiff HGR brought in additional supervision to oversee the job because RTG advised it that their current lease was ending and RTG needed to occupy the new space.[4] (*Id.* at 52:16–53:7). The Policy does not provide additional coverage to expedite completion of the project simply to accommodate RTG's need to transition from its former space into the new facility. Rather, the Policy states that "[i]n the event of covered 'loss' to Covered Property," Defendant Hanover will pay reasonable and necessary expenses incurred to "expedite the temporary repair and the permanent repair or replacement of Covered Property." (Doc. 184-1, p. 31). Since the claim for supervision expenses does not constitute expenses incurred to repair or replace Covered Property damaged by a covered loss and resulted from the desire to accommodate RTG's schedule, the jury erred as a matter of law in awarding damages for supervision expenses.[5] For these reasons, the Court enters judgment as a matter of law in favor of Defendant Hanover on Plaintiff HGR's claim for Supervision Expenses.

### 2.    IKON, CSS, and Landscaper Grading

The jury awarded Plaintiff HGR damages of $15,910.24 for materials, equipment, and services provided by Construction Site Specialists ("**CSS**"). (Doc. 182). The jury also awarded $6,400.00 for rework grading paid to a landscaper and $57,874.00 paid to a concrete contractor, IKON. (*Id.*). Defendant Hanover argues that none of these items are

---

[4]   For example, Mr. Minter testified that Mr. Jimmie Murphy was hired as a supervisor "to help with the acceleration due to the compression of the schedule to meet the date that Rooms To Go needed." (*Id.* at 77:13–20).

[5]   On cross-examination, Mr. Minter admitted the extra workers and supervisors were brought onto the construction site to meet the early completion deadline, leading to a $50,000 early completion bonus. (Doc. 209, 136:10–137:5).

covered under the Policy. First, Defendant Hanover submits the concrete poured by IKON in the back area of the site was unaffected by the flood and the other concrete work was part of a design change to expedite the completion of the Project, as opposed to repairing or re-grading Covered Property damaged by a covered loss. (Doc. 191, p. 8). Secondly, Defendant Hanover contends that the CSS expenses reflect work performed on the incomplete parking lot and the access road and that neither meet the definition of Covered Property. (*Id.* at p. 6). Thirdly, Defendant Hanover argues the landscape re-grading was not necessitated by a covered cause of loss. (*Id.* at p. 7).

### a.    The Flood

To understand Hanover's arguments, it is important to appreciate the timing of the flood versus the claimed expenses. Mr. Minter testified that while the project was ongoing, there was significant adverse weather, including flooding in early August. (Doc. 209, 41:2–5). As a result, landfill imported onto the project "turned to like a slick, muck type material." (*Id.* at 41:8–10). He explained that the only way to work with the land is to either let it dry out, regrade it, or remove it and bring in more dry material to replace it. (*Id.* at 41:10–14). That said, land is not Covered Property. (Doc. 184-1, p. 29).

### b.    IKON

Mr. Minter also testified that before the flood occurred, IKON prepared the land and had "poured a little bit of concrete in the rear of the project and had other areas ready to go." (Doc. 209, 54:21–25). He explained that the soil was already oversaturated before the flood, and afterwards there was standing water. (*Id.* at 55:1–7). The land turned into muck, which either had to be skimmed off and reworked or required additional material to be brought in. (*Id.* at 55:8–12). Yet land is not Covered Property, and re-grading or re-

preparing land is not covered under the Policy. (Doc. 184-1, pp. 29, 31). Mr. Minter explained that rather than wait for the land to dry out, Plaintiff HGR chose to skim off the muck, which required pouring an eight-inch concrete paving area for the parking lot rather than the original design calling for a six-inch paving area.[6] (Doc. 209, 55:8–22). Defendant Hanover correctly argues that because the parking lot was incomplete before the flood, it does not meet the definition of an appurtenant permanent structure, and Plaintiff HGR's decision to increase the volume of concrete from six to eight inches amounts to a design change not covered by the Policy.[7] As for the concrete poured in the back of the construction site, Mr. Minter acknowledged on cross-examination that none of that concrete work was redone after the flood. (*Id.* at 138:1–8). He also agreed that none of the rebar in the parking lot had to be repaired because of the flood. (*Id.* at 139:17–21, 140:20–141:1).

Based on the above, the Court finds that no objectively reasonable jury, based on the evidence and inferences adduced, could reach the verdict rendered in favor of Plaintiff HGR on the claims relating to work performed by IKON. The plain and unambiguous language of the Policy defines Covered Property, and an incomplete parking lot is not an appurtenant permanent structure. Plaintiff HGR, to complete the project early, decided to remove saturated land, or muck, and to replace it with engineered fill. In so doing, Plaintiff HGR elected to undertake a design change that also required an increase in the volume

---

6    Plaintiff HGR also added a foot of engineered fill on top of the subgrade before IKON did the concrete paving work. (Doc. 209, 62:2–24). This means that Plaintiff HGR regraded the land, which is not Covered Property, with the engineered fill.

7    *See* Plaintiff's Exhibit 54 (photo of removal of muck in parking lot to prepare the land for concrete, showing the parking lot is incomplete before flood). (Doc. 183-28, p. 64; Doc. 209, 72:8–18).

of concrete poured by IKON. The design change was no doubt driven by the uncharacteristically wet season. But the Policy only provides coverage for direct physical loss to Covered Property caused by a covered loss: flood. The parking lot was far from complete, with only rebar and framing in place when the flood occurred. Any direct physical loss caused by the flooding was limited to the land, which is specifically excluded from the definition of Covered Property. While it may have been good business sense for Plaintiff HGR to bring in additional fill dirt and concrete to get the job completed early, the Policy does not cover re-grading or repairing the land. For these reasons, the Court's grants judgment as a matter of law in favor of Defendant Hanover on the IKON claim.

### c.      Construction Site Specialists

Plaintiff HGR's claim for expenses incurred by Construction Site Specialists stems from building materials, work, and equipment rentals used to build up the access road running from the street to the back entry of the RTG building. (*Id.* at 57:21–58:23). Mr. Minter explained that because of the heavy rain, trucks entering the construction site had trouble navigating the temporary access road. (*Id.* at 58:7–11). Plaintiff HGR was responsible for maintaining the site to facilitate deliveries, including building materials and concrete. (*Id.* at 58:13–17; 69:8–17). As a result, Plaintiff HGR approached RTG with the problem and was advised to consult RTG's geo-tech engineer. (*Id.* at 59:12–25). The engineer recommended adding lime to the existing material to fortify the access road. (*Id.*). In discussing Plaintiff's Exhibit 63, the bill from CSS, Mr. Minter explained what the expenses represent:

> [The bills represent] stone that we brought in to help stabilize access, as well as rental equipment to go ahead and use and maintain that access, and also forklifts in there on the skid steer to help move material in and around the site.

(*Id.* at 82:6–18).

No doubt the heavy rain and flooding caused direct physical damage to the land; that is, the unimproved access road. As discussed above, land is not Covered Property. While flooding may be a covered loss, the next step in the analysis is whether the covered loss relates to Covered Property. Plaintiff's claim for expenses incurred by CSS fails the second prong of the analysis. Moreover, the access road was no more than unimproved land before the flood and does not satisfy the definition of a temporary structure. Unlike false-work, cribbing, construction forms, scaffolding, fences and signs, unimproved land is neither built nor erected at the construction site.

While the heavy rain and flooding may have rendered the access road impassable, Defendant Hanover did not bargain to assume this particular risk. There are many unforeseen events that delay completion of a construction project or increase the cost of completion, including equipment malfunctions, electrical outages, and the lack of adequate personnel. The mere fact that the Project becomes more expensive to complete than anticipated does not justify transferring those costs to the company issuing the Policy. For these reasons, the Court grants judgment as a matter of law in favor of Defendant Hanover on the CSS expenses.

### d.      Landscaper Grading

Mr. Minter testified that the grading expenses listed on the IKON invoice relate to the parking lot. (*Id.* at 141:2–6). For the reasons stated in Subsection 2(b), Defendant Hanover is correct that Plaintiff HGR failed to present testimony that the landscape grading resulted from a covered loss on Covered Property. As a result, the Court grants

judgement as a matter of law in favor of Defendant Hanover on the Landscaper Grading expenses.

### e.   *General Conditions*

Mr. James Wood is employed by Defendant Hanover and was called by Plaintiff HGR to testify at trial. (Doc. 211, 23:22–25). He explained that general conditions are expenses to operate a construction site, such as trailers, supervision, security, and the like. (*Id.* at 56:15–22).   Mr. Wood contended that general conditions are not payable unless the project is extended beyond the original completion date. (*Id.* at 57:1–8, 58:1–10, 59:18–22). Here, Plaintiff HGR completed the contract ahead of schedule and secured a bonus. (Doc. 209, 135:21–137:5). The Court thus finds that no reasonable jury could have returned a verdict in favor of Plaintiff HGR on the General Conditions expenses.

## IV.   CONCLUSION

Insurance coverage cases are uniquely complex, and it is often difficult for a lay jury to engage in the type of textual exegesis that courts undertake with the benefit of reflection. This jury conducted itself admirably, but the facts when applied to the unambiguous meaning of the Policy's terms do not support an award of damages in favor of Plaintiff HGR. For these reasons, Defendant Hanover's Motion for Judgment as a Matter of Law (Doc. 191) is **GRANTED**.

The Court reserves jurisdiction to address post-judgment motions, if any, by the prevailing party.

**DONE AND ORDERED** in Orlando, Florida on February 1, 2021.

20

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

20